FILED
**United States Court of Appeals**
**Tenth Circuit**

## UNITED STATES COURT OF APPEALS

## FOR THE TENTH CIRCUIT

**February 27, 2026**

**Christopher M. Wolpert**
**Clerk of Court**

_____

UNITED STATES OF AMERICA,

> Plaintiff - Appellee,

v.

RYAN LABS,

> Defendant - Appellant.

No. 25-1094
(D.C. No. 1:23-CR-00023-JLK-1)
(D. Colo.)

_____

### ORDER AND JUDGMENT[*]
_____

Before **MATHESON**, Circuit Judge, **LUCERO**, Senior Circuit Judge, and
**BACHARACH**, Circuit Judge.

_____

Ryan Labs appeals from the district court's denial of his motions seeking to

suppress evidence obtained from a vehicle search and to dismiss his indictment on

Second Amendment grounds. Mr. Labs was charged with one count of possession of

a firearm and ammunition by a convicted felon under 18 U.S.C. § 922(g)(1). He

---

[*] After examining the briefs and appellate record, this panel has determined
unanimously to honor the parties' request for a decision on the briefs without oral
argument. *See* Fed. R. App. P. 34(f); 10th Cir. R. 34.1(G). The case is therefore
submitted without oral argument. This order and judgment is not binding precedent,
except under the doctrines of law of the case, res judicata, and collateral estoppel. It
may be cited, however, for its persuasive value consistent with Fed. R. App. P. 32.1
and 10th Cir. R. 32.1.

entered a conditional guilty plea, reserving his right to appeal the denial of his motions. The district court sentenced him to 30 months in prison and three years of supervised release. We have jurisdiction under 28 U.S.C. § 1291 and affirm.

## I.  BACKGROUND

### A. *Factual History - Motion to Suppress*

The district court made the following factual findings concerning the vehicle search:

> This case stems from [an October] 30, 2022 traffic stop in Berthoud, Colorado.[1]  Larimer County Sheriff's Department Deputy Justin [Napolitano] pulled over a vehicle for failure to display license plates. Mr. Labs was a passenger in that vehicle. Deputy Napolitano asked for [the driver] Ms. Dillon's and Mr. Labs' identification, as well as proof of ownership and insurance on the vehicle. . . .
>
> The transcript of [Deputy Napolitano's] body microphone video recording . . . shows Ms. Dillon and Mr. Labs cooperating with Deputy Napolitano. Ms. Dillon provided her name and driver's license number, Mr. Labs' name, and contacted the previous owner of the vehicle for ownership and insurance information. . . .
>
> After Ms. Dillon provided her and Mr. Labs' identification information, Deputy Napolitano radio dispatched to check the information and almost immediately requested the canine. This request occurred 4 minutes and 45 seconds after he initiated the traffic stop, but it happened before Ms. Dillon provided any information related to the ownership and insurance of the vehicle. . . .
>
> During Deputy Napolitano's call [with dispatch], after he provided Mr. Labs and Ms. Dillon's information but before dispatch came back with information confirming the information, another officer, [Sergeant] Thiemann . . . informed Deputy Napolitano that he

---

[1] The parties agree that the stop occurred on October 30, 2022, rather than March 30, 2022, as the district court stated.

was familiar with Ms. Dillon. This officer stated, "She's got recent intel for distributing fentanyl and meth."

The full dispatch recording makes clear that Deputy Napolitano requested the canine only after he received the information about Ms. Dillon from Sgt. Thiemann. . . . The government identifies additional facts to support Deputy Napolitano's reasonable suspicion that criminal activity was afoot. Among other things, Deputy Napolitano observed that:

[1] Ms. Dillon pulled into a location he personally knew as a hot bed of drug dealing, Love's Travel Center, . . . and immediately left in the same direction.

[2] Ms. Dillon drove for 500 yards before pulling over.

[3] Ms. Dillon lied about being at Love's[; and]

[4] it was late at night on a minor road which was less likely to advertise or have hotels nearby and [finding a hotel room] was Ms. Dillon's stated reason behind the travel. . . .

Deputy Napolitano's stop report states he observed that Dillon was having trouble staying on topic and answering questions directly. Dillon had "cotton mouth" with white saliva gathering at the corners of her mouth. When . . . [Napolitano], brought this to her attention, she stated that she was taken taking a prescription medication and cotton mouth was a side effect of it. . . .

Deputy Napolitano asked Ms. Dillon whether she had consumed any alcohol or narcotics that evening. She responded no. Nevertheless, Deputy Napolitano asked Ms. Dillon to submit to a roadside sobriety test. Ms. Dillon agreed to the sobriety test which was conducted by Deputy Napolitano's partner. Deputy Napolitano spoke with Mr. Labs while Ms. Dillon was taking the sobriety test. He asked Mr. Labs to step out of the vehicle. Mr. Labs complied, but although it was late at night in March, he first removed his jacket and left it in the vehicle. Deputy Napolitano searched Mr. Labs and did not find anything of note.

As Ms. Dillon completed her sobriety test, the canine arrived on the scene and searched the vehicle. The canine alerted. The officers on the scene then searched the vehicle. They located and seized among other things a loaded firearm in Mr. Labs' jacket and ammunition in the vehicle. The officers arrested Mr. Labs.

R., vol. 3 at 23-27.

## B. *Procedural History*

Relying on its factual findings, the district court determined that Deputy Napolitano had reasonable suspicion to suspect drug-related activity when he requested the canine sniff.  It therefore denied Mr. Labs's motion to suppress.

Mr. Labs also moved to dismiss the indictment, arguing that the felon-in-possession statute, § 922(g)(1), is unconstitutional under the Second Amendment, both facially and as applied to him.  The district court rejected the Second Amendment challenge and denied the motion to dismiss.

## II.  DISCUSSION

### A. *Motion to Suppress*

#### 1.  Standard of Review

"When reviewing the denial of a motion to suppress, we view the evidence in the light most favorable to the government, accept the district court's findings of fact unless they are clearly erroneous, and review de novo the ultimate question of reasonableness under the Fourth Amendment."  *United States v. Mayville*, 955 F.3d 825, 829 (10th Cir. 2020) (internal quotation marks omitted).  "A finding of fact is clearly erroneous if it is without factual support in the record or if, after reviewing all of the evidence, we are left with the definite and firm conviction that a mistake has been made."  *United States v. McGregor*, 158 F.4th 1082, 1091 (10th Cir. 2025) (internal quotation marks omitted), *cert. denied,* 2026 WL 490606 (U.S. Feb. 23,

2026).  We "defer to the ability of a trained law enforcement officer to distinguish between innocent and suspicious actions."  *Id.* (internal quotation marks omitted).

## 2.  The *Rodriguez* Standard and Reasonable Suspicion

The Fourth Amendment protects individuals from "unreasonable searches and seizures."  U.S. Const. amend. IV.  "A traffic stop constitutes a seizure under the Fourth Amendment, and to be reasonable, the stop must be justified at its inception and the officer's actions during the stop must be reasonably related in scope to the mission of the stop itself."  *United States v. Baker*, 108 F.4th 1241, 1246 (10th Cir. 2024) (ellipsis and internal quotation marks omitted).

Mr. Labs does not challenge the initial justification for the traffic stop. Instead, he argues Deputy Napolitano unreasonably prolonged the stop by calling for a canine unit to investigate without independent reasonable suspicion.  "[A]n unlawful seizure occurs when an officer (1) diverts from the traffic-based mission of the stop to investigate ordinary criminal conduct, (2) in a way that prolongs (i.e., adds time to) the stop, and (3) the investigative detour is unsupported by any independent reasonable suspicion."  *Id.* at 1248 (internal quotation marks omitted); *see Rodriguez v. United States*, 575 U.S. 348, 357-58 (2015) (establishing the three-part test).

To determine whether a stop was unlawfully prolonged, we look for the "*Rodriguez* moment"—"when the officer extended the stop by engaging in non-traffic inquiries."  *United States v. Frazier*, 30 F.4th 1165, 1179 (10th Cir. 2022) (internal quotation marks omitted).  If reasonable suspicion is lacking at the

5

"*Rodriguez* moment," the seizure of the individual is unlawful from that point forward.  Later events cannot supply the required reasonable suspicion.  *See id.*

"The Supreme Court has defined reasonable suspicion as a particularized and objective basis for suspecting criminal conduct under a totality of the circumstances." *United States v. Munoz*, 162 F.4th 1210, 1219 (10th Cir. 2025) (internal quotation marks omitted).  "This totality of the circumstances approach precludes a divide-and-conquer analysis, where the court views each factor that would support reasonable suspicion in isolation." *Id.* (internal quotation marks omitted).  But "reasonable suspicion can be founded on a combination of factors that individually may be susceptible of innocent explanation." *United States v. Lopez*, 849 F.3d 921, 925 (10th Cir. 2017).

Although the government bears the burden of proving reasonableness, the standard is not burdensome:

> [R]easonable suspicion is not, and is not meant to be, an onerous standard. The reasonable suspicion standard requires considerably less than a preponderance of the evidence and obviously less than probable cause.  It does not require an officer to rule out the possibility of innocent conduct, nor does it require an officer to have evidence suggesting a fair probability of criminal activity.  As long as an officer has a particularized and objective basis for suspecting an individual may be involved in criminal activity, he may initiate an investigatory detention even if it is more likely than not that the individual is not involved in any illegality.

*Munoz*, 162 F.4th at 1219-20 (citations, emphasis, and internal quotation marks omitted).

3. **Analysis**

The district court determined the *Rodriguez* moment occurred when Deputy Napolitano requested the canine sniff,[2] based largely on the information transmitted by Sergeant Thiemann about Ms. Dillon's suspected involvement in the drug trade. Other factors also supported reasonable suspicion. Ms. Dillon did not stop immediately. *See United States v. Villa-Chaparro*, 115 F.3d 797, 802 (10th Cir. 1997) ("[A] driver's failure to promptly stop an automobile in response to flashing police lights" supports reasonable suspicion). It was late at night on a minor road. *See United States v. McHugh*, 639 F.3d 1250, 1257 (10th Cir. 2011) (reasonable suspicion supported by the fact that the incident occurred late at night). And Deputy Napolitano observed Ms. Dillon pull into Love's, a location he knew as a hot bed of drug dealing, and then immediately leave.[3] Under the totality of the circumstances, we agree with the district court that Deputy Napolitano had developed reasonable suspicion to extend the traffic stop when he requested the dog sniff.

---

[2] Mr. Labs suggests two additional, later *Rodriguez* moments: (1) when the seller had verified the sale and status of the vehicle, and (2) after Ms. Dillon successfully passed the roadside sobriety tests. Because we conclude Deputy Napolitano had reasonable suspicion of drug-related activity by the time he requested the canine sniff, and because Mr. Labs has not shown that the reasonable suspicion dissipated between the request and his arrest, we need not address these later-suggested *Rodriguez* moments.

[3] The parties disagree whether Ms. Dillon lied to Deputy Napolitano about her having been at Love's. Because the record is unclear on this point, we do not consider it in our reasonable suspicion analysis.

Mr. Labs appears to argue that even if Deputy Napolitano had reasonable suspicion of drug activity when he called for the dog sniff, he unreasonably prolonged the stop while waiting for the dog to arrive because the original purpose of the traffic stop had been resolved, and "no additional facts [were] gained . . . to allow the continued detention." Aplt. Opening Br. at 23-24. This argument is not persuasive.

First, given that Deputy Napolitano had developed reasonable suspicion of drug-related activity that had not dissipated, the delay did not make the continued stop unreasonable. *See Baker*, 108 F.4th at 1248 n.3 ("An officer can always prolong a traffic stop with reasonable suspicion of criminal wrongdoing."); *United States v. Campbell*, 156 F.4th 1019, 1024 (10th Cir. 2025) ("[S]o long as reasonable suspicion is not clearly refuted, continued detention may be justified."); *see also Amundsen v. Jones,* 533 F.3d 1192, 1200 (10th Cir. 2008) (holding that reasonable suspicion of drunk driving, based on weaving between lanes, continued through duration of field sobriety tests even though defendant's "behavior during the stop did not provide additional evidence of impairment" (emphasis omitted)).

Second, and more important, under our precedent, Deputy Napolitano did not unreasonably prolong the stop during the approximately 20 to 30 minutes between the time he developed reasonable suspicion of drug-related activity and when the canine arrived and alerted. *See, e.g.*, *Villa-Chaparro*, 115 F.3d at 802-03 (upholding detention founded upon reasonable suspicion where officer detained defendant for

8

five minutes from the time he stopped him until requesting a canine unit, and then for an additional thirty-eight minutes until the canine unit arrived).

In sum, we conclude the district court properly denied the motion to suppress.

## B. *Motion to Dismiss*

Citing our decisions in *Vincent v. Garland*, 80 F.4th 1197, 1202 (10th Cir. 2023), *vacated*, 144 S. Ct. 2708 (2024), and *United States v. McCane*, 573 F.3d 1037, 1047 (10th Cir. 2009), and after also conducting its own thorough analysis under *New York State Rifle & Pistol Ass'n, Inc. v. Bruen*, 597 U.S. 1 (2022), the district court denied Mr. Labs's motion to dismiss on Second Amendment grounds. Mr. Labs concedes that *Vincent v. Bondi*, 127 F.4th 1263, 1266 (10th Cir. 2025), *petition for cert. filed*, (U.S. May 12, 2025) (No. 24-1155), forecloses his Second Amendment challenge, which he now raises for preservation purposes only. We therefore affirm the denial of his motion to dismiss the indictment.

## III. CONCLUSION

We affirm the district court's denial of Mr. Labs's suppression motion and motion to dismiss. We therefore affirm the district court's judgment.

Entered for the Court

Scott M. Matheson, Jr.
Circuit Judge

9